STEELE *v.* CHICAGO & GRAND TRUNK RAILWAY CO.

1. Railroad Companies—Accident at Crossing—Sufficiency of Declaration.
   A declaration in an action against a railroad company, alleging that plaintiff's intestate was negligently signaled by a flagman in defendant's employ to pass over the track at a public crossing, which the deceased thereupon attempted to do in a careful and prudent manner, and that while on said track, by reason of defendant's negligence as aforesaid, he was run into and killed by a passing train, is not subject to the objection, raised for the first time on appeal, that it does not specifically aver that the deceased relied upon the signal given.

2. SAME—QUESTION FOR JURY.

    In an action for the death of plaintiff's intestate, caused by a
collision at a railroad crossing, the testimony tended to show
that a freight train had parted near the middle, apparently
without negligence on the part of the defendant; that the flag-
man stationed at the crossing, after the first section of the
train had passed, signaled that the track was clear; that the
deceased thereupon attempted to drive across the track, and
was struck by the second section of the train, which was fol-
lowing the first at a distance of about 100 feet; that it was very
dark at the time; that it was the custom to maintain lights at
the rear of a train, and that there were none upon the last car
of the first section. It further appeared that the flagman had
been employed at such crossing for two years, during which
time no train had parted; and that, upon the occasion in ques-
tion, almost immediately after giving the signal to cross, he
discovered the approach of the second section, and did all that
he could to prevent the accident. *Held,* that the question of
the flagman's negligence was for the jury. GRANT, J., dis-
senting.

Error to Lapeer; Moore, J. Argued and submitted
April 19, 1895. Reargument ordered July 2, 1895.
Reargued November 8, 1895. Decided December 24, 1895.

Case by Mary M. Steele, administratrix of the estate of
Newman Steele, deceased, against the Chicago & Grand
Trunk Railway Company, for negligently causing the
death of plaintiff's intestate. From a judgment for
plaintiff, defendant brings error. Affirmed.

The defendant's road, consisting of a single track, runs
east and west through Imlay City. Almont avenue, one
of the principal streets, runs north and south, crossing
the track at right angles. From a point nearly a mile
west to the crossing, it is down grade, so that a train will
run between these points of its own accord. On the even-
ing of January 6, 1891, about 8 o'clock, a freight train,
consisting of 22 loaded cars, 5 empties, and a caboose,
going east, parted about in the middle, at some point on
the down grade, on account of the breakage of a coupling
pin. The night was very dark. A flagman named Stan-

ley was stationed at the crossing. The little house he occupied was situated on the south side of the track. On the approach of the train he emerged from the house, and walked across the highway, on the south side, swinging his lantern east and west, as a signal to warn travelers upon the highway that a train was approaching. Plaintiff's decedent, with his son, was riding in a road cart drawn by one horse along Almont avenue, from the north. Two witnesses, Mr. and Mrs. Donaldson, were driving in the same direction, and a little ahead of the deceased. Mr. Donaldson, on seeing the flagman's signal, stopped his horse between 40 and 50 feet from the track, on the west side of the highway. Mr. Steele stopped on the east side, 15 or 20 feet behind Mr. Donaldson. As the first section of the train was passing, Donaldson walked his horse slowly towards the track, so that, when the first section passed, his horse's head was within 20 feet of it. Donaldson heard the train before the flagman came out. Just as the first section went past, Mr. Steele drove fast past Mr. Donaldson. The second section came along just as the head of Mr. Steele's horse had reached the track. The horse reared, and turned to the east. The road cart was thus thrown round, striking the car, and Mr. Steele was killed. His horse was not killed. The pin showed a fresh, bright break, and nothing unusual was shown to have caused it. The train was entire at the summit of the grade when the engineer shut off steam. The front and rear brakemen set the usual number of brakes to steady the train on the down grade. After passing what is known as the "P., O. & N. Crossing," the engineer gave the signal to let off the brakes, which was done; the front brakeman returning to his place in the cab, and the rear brakeman to his place in the caboose. The P., O. & N. crossing is 2,500 feet from Almont avenue. None of the trainmen knew that the train had parted until they had passed some distance beyond the city. The conductor and rear brake-

man first discovered it when the train slackened while going up another grade, about a mile east of the city. The rear brakeman saw the light carried by the front brakeman as he was setting the brakes.

The engineer, a witness for the plaintiff, testified:

"After I got down the grade, I commenced working steam, after I passed the P., O. & N. crossing. Just as soon as they let off the brakes, I commenced using the steam. I didn't commence using the steam until I felt that the brakes were off. I can tell when the brakes were let off. The cars would crowd up a little on the engine. * * * I know the train was all together and all right when we were coming down the grade, because I could tell the way it came down by the brakes holding the train."

The train was going about 20 miles an hour. The rear section at Almont avenue was about 100 feet in rear of the first, and must have been going nearly as fast. The train parted at some point between the P., O. & N. crossing and Almont avenue.

Mr. and Mrs. Donaldson testified that, after the first section had passed, the flagman walked towards the track, swinging his lantern north and south, as a signal that the train had passed, but that almost immediately, discovering the other section coming, he again swung his lantern vigorously east and west. The flagman denied that he gave any signal to cross, by swinging his lantern north and south. The flagman had been stationed at this crossing for two years, during which time no train had ever before parted. The trainmen, who had been on the road much longer, also testified that during their employment no such thing had happened there before.

Mr. and Mrs. Donaldson were the only eye-witnesses to the transaction sworn on the part of the plaintiff. Mr. Donaldson's testimony is as follows:

"The cars came along from the west to the east, and his horse was going south, and, as far as I could see with my lantern and the lamplight,—it was a very dark night,

and a very cold night; and the horse raised right up on his hind feet, and as he touched, as far as I could ascertain, the side of the car, the horse turned his head to the east, the same way the cars were going, and threw the cart around so that I heard the crash of the little wheels. * * * While the train was going along, my horse kept moving up a little towards the track, and, at the time the first section went by, I think, my horse's head had got within 20 feet of the track; and, as the train went by, the watchman had passed, and I saw him at the west side. In the first place he stood very near the walk, with his lantern close by him. That was when he first came out. I didn't see him come out of his little flag station. I saw him when he just started from there, going across to the west. When he first swung the lantern, he was within 20 feet of his little office, making west. I heard the train before I saw him come out. After the first section went by, he moved over a little nearer to the west side of the track, and the lantern, as he was walking, was swung by his side, east and west, as he crossed just in that way, as he came over by the station, and then he turned around near the west sidewalk. He faced north, —had his face towards the crossing between him and me. As long as the first section hadn't gone by, he kept swinging his lantern. After the first section went by, when I saw him, he was standing still, with the lantern by his side, right by the west sidewalk, and the lantern was standing right down in his hand,—in his right hand, by his side; and just then he started to come on north, to come up towards me. I should say he was about 20 feet from the south side track. I think he must have taken 3 or 4 steps. My horse had worked up a little towards the west, and a little south; and, just as soon as the first section went by, Newman Steele started his horse, and his horse went by me fast. He started. You could see a vacant place, and he could see it. I didn't notice any lights on the end of the first section. I didn't pay any attention to it. I didn't think anything about it.

"*Q.* And, just the moment that the forward section went by, Newman Steele started up his horse, didn't he, instantly, on a very sharp gait?

"*A.* He started as quick as—about the same time that —the old gentleman came on. He went by me quick-

ly, at a rapid gait. When the train went by, my mare
cramped to the west, and I tried to make her go ahead
because the signal had stopped. Then Mr. Steele passed
me on a trot, and just as he came along I came along,
and my horse kept going onto the track, and then the
other section came along. Mr. Steele had driven by me
before my horse had straightened up so I could go. I
saw the second section coming, and stopped my horse.
The train was just on the edge of the highway, and when
I stopped my horse he was from 10 to 12 feet from the
first track.   *   *   *   I knew as soon as the train went
by, and it wasn't necessary for the flagman to tell me.
I would go right on myself. And on this occasion, just
as soon as the train went by, I thought everything was
through, and tried to start right along,—tried to go. I
didn't notice whether there was any caboose at that time
or not. I didn't pay any attention to it. ·If we had been
paying attention to the rear end of the first part of the
train, I could have told whether there was a caboose or
not.   *   *   *   As soon as the other section was coming,
I could see him swing it across again. I think I saw
him swing the lantern twice or three times before the
second section same along. It was a very short time
before Mr. Steele was killed. That and the noise caused
me to stop my horse.   *   *   *

"*A. So he came along then, and when he stopped, close to the
side track, he shook it the other way.*

"*Q. Now, that was before you started at all?*

"*A. Before I had started at all.*

"*Q. And that must have been before Steele went by you, too,
wasn't it? Had Steele gotten by you at that time, Mr. Donald-
son?*

"*A. He was very likely very near opposite.*

"*Q. About opposite you, when he commenced to swing it, you
say, right across the track again?*

"*A. Yes, sir.*

"*Q. But his horse was going so fast that he could not check it?*

"*A. That's right.*

"*Q. And that is about the way you think it occurred, isn't it,
Mr. Donaldson?*

"*A. Yes, sir.*"

Mrs. Donaldson's testimony is substantially the same
as that of her husband. In describing the time, she testi-
fied:

"It was all done in a great deal less time than we are talking about it,—within a second or two. Our horse came very near the track. He had turned his head to the west, and it seemed as if the train must have struck him. It does seem as if the first and second sections were 100 feet apart. Our horse had just time to stop before the second one came along."

She also testified that, after swinging the lantern north and south, the flagman commenced to swing it very violently east and west again, and that Steele was then somewhere between her and the cars, and that it was the second car of the second section which struck the deceased.

Mr. Stanley, the flagman, testified as follows:

"After I saw that the train was approaching the crossing, I went out on the side track on the south side, and I gave a signal to the engineer that the crossing was all right, and swung my lantern east and west, crossways of the track, to signal any person who might be approaching the crossing to stop. When the train went by me, I saw they were broken in two; and then I signaled at the crossing north and south, and, for fear any one might be coming, I hallooed out, and told them to keep back, the cars were coming; and I scarcely had the words expressed until the cars came right up,—that is, the second section. * * * It was a very dark night. I didn't see any one approaching after the first section went by. I didn't see Mr. Steele coming; but, the reason I hallooed, I thought somebody might be coming up on the other side, so I hallooed out as loud as I could. I told them the cars were coming,—to keep back; and I also swung my lantern across the track. This was immediately after the first section went by. This occurred about eight o'clock in the evening, standard time. When I discovered there was no light on the rear end, I was in the center of the side track, on the south side. I commenced to halloo right away, and I scarcely had the words expressed when the rear section was right to me."

The above is a substantial statement of all the testimony from which negligence can be inferred. While several acts of negligence are alleged in the declaration,

only one was submitted to the jury, viz., whether the flagman was negligent in not sooner discovering that the train had parted, and that other cars were coming, and in swinging his lantern north and south, as a signal to travelers to cross.

*Geer & Williams,* for appellant.

*Stickney & Halpin,* for appellee.

GRANT, J. *(after stating the facts).* The plaintiff's position is thus stated in her brief:

"The defendant was negligent, through the flagman, in signaling the parties to advance and go upon the track under the circumstances, for the flagman was in a position and so near the rear section that he must have known that another train, or section of a train, was rapidly advancing on the crossing. A glance at the rear of the retreating train would have satisfied or informed him that there was trouble with the train, and, as a flagman, he was bound to know whether the track was clear, and it was safe for the parties to pass over the track, before he gave the signal to advance."

There is no evidence, nor was it contended in the oral argument, that the flagman had actual knowledge that the second section was approaching when he swung his lantern north and south. Such an act would not only be gross negligence, but would be criminal. It was argued by counsel for plaintiff, upon the oral argument, that it was the absolute duty of the flagman to know that the track was clear before signaling, and that, although he acted prudently and with due caution, still the defendant is liable. This would result in holding the defendant to be an absolute insurer of safety when it has a flagman, and to establish a liability without negligence. In other words, it would establish the rule that, when one invites another upon or across his premises, he guarantees their safety. There is no such rule, nor was this case submitted to the jury upon any such theory. The

sole basis of the verdict is that he did not use due dili-
gence to ascertain whether the track was clear, and gave
the signal without first performing that duty.    In deter-
mining this question, the court, as well as the jury, must
consider the situation as it appeared to the flagman at
the time. It is easy afterwards to see how most accidents
could have been avoided, but that is not the question,
but, rather, could the accident have been avoided by the
exercise of reasonable care and diligence?

The flagman did all in his power to give notice of the
approach of the rear section as soon as he discovered
it.  Should he, in the exercise of common prudence, have
discovered it earlier?  Upon the answer to this question
depends the defendant's liability.  He swore positively
that he immediately discovered the trouble, and gave
warning.  If it were the fact that he saw the second sec-
tion coming, and gave no warning, then the negligence,
if any, would be in failing to give a signal, instead of
giving one.  The duty to give the signal was imperative
the moment the danger was discovered.  The flagman
did in fact discover the rear section approaching before
it reached the crossing, and immediately thereupon vig-
orously signaled.  Mr. Steele's horse had not then reached
the track, nor had he reached it when the first car of the
rear section was upon the crossing, but he was very near
it.  He reared and plunged to the east, and the cart was
thrown against the second car.  No one places the dis-
tance between the two sections at the crossing in excess
of 100 feet.  The time was so short that Mrs. Donaldson
said it was a second or two.  According to Mr. Donald-
son, the flagman had swung his lantern two or three
times as a warning after the first section passed,
and before the second came.  Whether Mr. Steele, in
driving rapidly towards the crossing, acted upon the sig-
nal supposed to have been given, or upon the natural
supposition that the train had passed, as did Mr. Donald-
son, is not, of course, known.  One would naturally pre-

sume that the entire train had passed. Mr. Donaldson testified that he would not wait for a signal after the train had passed. But is it not a fair inference that if he had seen the signal, as did Mr. and Mrs. Donaldson, he could have stopped his horse in time to avoid the accident, provided he had him under proper control?

The flagman had been there for two years. No such accident as the parting of a train had ever occurred there. To hold the flagman guilty of negligence under these circumstances is to say that it was his duty to look out for an unusual and unexpected accident; to determine instantly that the train had parted, and that the rear section was immediately following; to see that there were no lights upon the rear car of the first section, and determine whether it was an unlighted caboose or a freight car; to then look to the west, and if he saw a light, which to him would appear stationary until very near him, to determine that it was upon the caboose, and that it was approaching; and then to swing his lantern as a signal to travelers upon the highway, whom he cannot see, and of whose presence he may be ignorant; and to do all this in a night so dark that objects can be seen but a few feet distant. The law of common prudence and care does not require such instantaneous action of mind and body, nor "does it require men to be on a constant lookout for dangers that cannot be expected to exist." *Grand Rapids & Ind. R. Co.* v. *Martin*, 41 Mich. 670. In my judgment, the flagman acted with all the promptness and care which the law requires. This was one of those unfortunate and distressing accidents which could not well be foreseen, which no one could be expected to anticipate, and for which no blame attaches to any one.

An important question is raised upon the pleadings, which, in my view of the case, it is unnecessary to discuss.

The judgment should be reversed, and, since no differ-

ent state of affairs can possibly be shown upon a second trial, none should be ordered.

Montgomery, J. The statement of facts prepared by Mr. Justice Grant covers the main features of the case. It is only necessary to add that there was evidence for the jury that the flagman swung the lantern north and south, and that this was intended for a signal to advance. Mrs. Donaldson testified: "As we approached the crossing, I saw the flagman swinging the lantern, and then we stopped, and heard a train coming; and afterwards, after the first section passed, we saw him there, swinging the lantern north and south." The flagman testified that the signal which he was accustomed to give to indicate that it was safe to advance was to swing his lantern north and south.

1. It was insisted on the argument that the declaration was defective in that it failed to aver that the deceased relied upon the signal to advance. The declaration contained the averment:

"The said Newman Steele was then and there negligently and carelessly signaled by said flagman  *  *  * to pass over said track, as said track was clear, which the said Newman Steele then and there attempted to do, by going upon said track in a careful and prudent manner at said crossing; and while on said track at said crossing, and by reason and on account of such carelessness and negligence on the part of said defendant as aforesaid, the said Newman Steele was run into."

This certainly states, by inference, that Newman Steele was on the track because of this negligence of defendant; and, while the manner of stating the fact was open to objection by special demurrer, the defect was not pointed out in this manner, or in any other manner, specifically, on the trial. The nearest defendant's counsel came to making the point was during the taking of testimony, when an objection was made as follows: "We object to this under the declaration, because there is nothing in

the declaration that would indicate negligence on the part of the defendant company in giving him the signal to come on, or in omitting to give the signal for him to stop, before the second section arrived." This gave no intimation that defendant claimed any fault in the averment that deceased *relied* upon the signal. The defect, if it had been pointed out, was subject to amendment, and the judgment ought not to be disturbed on this ground.

2. In our opinion, there was a question for the jury in this case. Certainly great care was due from the flagman, and to be expected by the public. So dangerous is an attempt to cross a railroad track without an assurance of safety that it is held negligence, as a matter of law, for a traveler to make the attempt without assuring himself, by the use of his senses, that the way is clear. The very purpose of maintaining a flagman is to give this assurance to the traveler, and the care required should be measured in view of the consequences likely to result from an error in judgment, or want of the most accurate attention. In this case it appears that the flagman was experienced; that he had never known a freight train to pass without a caboose in the rear, and at night there was always a red light in the rear of the train, and white lights at the side of the caboose. In fact, it is unnecessary to say that the maintaining of this rear light is essential to the safety of the trainmen and the property of the company. These lights were wanting on that portion of the train which passed the flagman. By the defendant's theory, the gap between the two sections of the train was only about 100 feet. I think we cannot say, then, as a matter of law, that if the flagman had looked he would not have seen the light, or that he was not negligent in failing to discover that these lights were missing from that portion of the train that had passed, or that he was in the exercise of such care as the occasion and circumstances demanded, in giving assurance of

safety to the deceased by the signal to advance. It is said in the brief of defendant's counsel that it was the duty of the flagman to look in the direction from which the train had come, not where it was going. There is strong ground for the inference that, if he had looked in that direction, he would have seen the approaching detached section. But, in our view, his duty did not consist wholly of looking in the one direction. It was certainly his duty to satisfy himself that the train had passed, before signaling the deceased to approach; and, in looking to ascertain this, he would most naturally have looked for the rear light. If this was missing, what would its absence suggest, and what was then the duty of the flagman? These, we think, were questions for the jury.

We find no error. Judgment affirmed.

McGRATH, C. J., LONG and HOOKER, JJ., concurred with MONTGOMERY, J.